Good morning and may it please the Court. The 105 patent at issue in the IPR covers the operation of the market-leading home plug glucose monitor, and the Board's decision finding all three claims of that patent invalid illustrates the dangers of disregarding the legal safeguards against use of hindsight and an obvious misdetermination. Well, let's take the combination of Winata and Shulman. Yes. Winata shows a reference electrode which is upstream of two working electrodes, according to the Board, and they found that there would be a motivation to combine that with Shulman. So what's wrong with that? Why isn't that supported by substantial evidence? There are at least two reasons. First of all, with respect to the Board's finding about Winata, there's no dispute. In fact, the Board and Pharmatech agree that Winata does not disclose two working electrodes. According to the 105 patent claims, there have to be two working electrodes. They're called sensors in the claims. Yes, but the Board found that it would have been within the skill of someone in the art to turn the other electrode into a working electrode. They said it would have been capable of being used in that regard and could have been turned into that, and there was absolutely no evidentiary basis for the Board's finding in that regard. The only evidence of what one skilled—well, frankly, there was no evidence presented by Pharmatech about how one of ordinary skill in the art at the time of invention would have read Winata, because its only declaration of evidence was from Dr. Wayne, who did not even address what the level of ordinary skill in the art was. And he certainly did not address any of his statements or his conclusions about the prior art from the context of one of ordinary skill at the time of the invention. The combination doesn't produce the invention because there's a second working electrode missing. Is there any other argument? Well, that's one reason, that Winata does not disclose the strip elements of the claims. What's the other argument? The other argument is that there's no evidence of motivation to combine. The only evidence—again, we have Dr. Wayne's declaration testimony not based or viewed from the prism of one of ordinary skill in the art at the time of the invention. The only statement in that declaration that Pharmatech or the Board can point to as motivation for combining Winata or Nankai with Schulman is an 18-word statement that use of a known technique to improve similar devices in the same way and the results would be predictable. That's the only thing they can point to. Is it your position that the Board couldn't look at the two references and find motivation within the references themselves? Not on this record, Your Honor. This is not an examination proceeding. It was an adjudicative proceeding, and Pharmatech had a burden of proof, a burden of coming forward with evidence that would show by preponderance of the evidence that this invention was obvious, that one skill in the art would have looked at these references and come to this conclusion. What if we think that it's okay to submit the act of submitting the very references that supply the motivation would be enough? Well, in this case, they are not enough, and there may be cases, Your Honor, where that would be enough, but the reason motivation… We just decided a case called Belden in which we approved that. You're familiar with the case? I am, Your Honor. This case is… But my description of Belden is accurate, isn't it? Well, in this case, the motivation… Answer my question. I'm sorry, Your Honor. Isn't my description of Belden accurate where we approve the Board's reliance on the references? In that particular case, yes, Your Honor. In this case, the reason that evidence of motivation to combine is so critical, again, to avoid use of hindsight, is this is not a case where you could just pluck from one reference one element of the claim, pluck from another reference an element of the claim, and put them together, and you have the claimed invention. You first had to look at each of the references and modify each of them. You had to modify NANCHI to come up with the stripped elements of the claims. You had to modify WINARTA to come up with the stripped elements of the claims. You had to modify SHULMAN. You had to have some reason why somebody skilled in the art would have looked to SHULMAN to an instance where you have implanted blood sensors that are awash with blood and would have looked to that and have thought to combine anything from SHULMAN with these other patents that relate to disposable test strips to which small amounts of blood are applied. And there was no evidence of the record here, and I would submit that based on these references, it was not enough for the board to go in and make its own findings about what somebody skilled in the art at the time would have thought of these references, or that one skilled in the art would have been motivated to combine these references. But you said you had to modify NANCHI. The modification, though, there were not a broad range of possible modifications, correct? Well, there's argument to that effect. Obviously, Your Honor, there was not a broad range of modifications, but there's no evidence in the record that somebody skilled in the art would have found each of those potential modifications to be applicable or possible. It's not like one of the cases that Pharmatech relies upon and the board relied upon, one of the range cases, like in Woodroof, where you have a range of 36 to 74, and you have something within that range, and the argument was, or the holding was, unless you can show that there was something unexpectedly advantageous about that, it would be prima facie obvious. Well, that's not the case here. In the case of a range from 36 to 72, I know what everything in that range is, and there's no reason to believe that they are distinguishable from one another because the prior art claims it. Here, in NANCHI, all we had is this. You're suggesting that obviousness trie is limited to range situations? No, I'm not, Your Honor. I'm saying that the Woodroof holding that said that there had to be a showing of unexpected, a showing of an advantage had to be shown to be unexpected in the context of an overlapping numerical range is not applicable to a situation like NANCHI, where the only disclosure in NANCHI was that the invention is not limited to what's shown in the figures. And from that, Pharmatech and the board takes, well, somebody skilled in the art would have modified NANCHI to put the reference sensor upstream of the working sensors, even though all we have is a conclusory statement after the fact hindsight statement from Pharmatech's expert to that effect. And even though there was substantial evidence presented by LifeScan through its expert, Dr. Smith, saying, you know, it's really critical to put the reference electrode upstream of the other electrodes, and there's nothing in NANCHI to suggest that that's the case. But it is shown in Winarda. For one electrode. For one electrode. The reference electrode is upstream in Winarda, right? Yes, but the examiner did neither the board nor Pharmatech espouse a combination of references of NANCHI plus Winarda plus Shulman. So that's not a rejection that was made. That's not a rejection that was briefed here. The two rejections were NANCHI plus Shulman and Winarda plus Shulman. And the thing that's missing from the Winarda-Shulman combination is, in your view, the second electrode. The second electrode. And any evidence that one skilled in the art would have made that modification. It's not enough to say they could have, but would they have done so? Because it's undisputed they would have had to have made modifications to do so. It's undisputed there would have had to have been made a modification. That's always the case when you combine prior art, that there have to be some modifications, right? No, I don't think it is always the case, Your Honor. I think sometimes in simple mechanical inventions you can take, you know, an element from reference A and an element from reference B and put them together and there's the invention. But in a complex technology like this, where it's an admittedly high level of skill of the art, bachelor's degrees in chemistry, electrical engineering, and at least five years experience working with electrochemical sensors, something more is needed to justify or to support evidentiarily an obviousness rejection. Doesn't that very high level of skill in the art actually weigh against you under KSR and that it should be viewed from the skill of such a high level that it wouldn't have been? KSR says we've got to use the common sense, the common sense level of one of ordinary skill in the art and their knowledge, not just discount that with respect to these modifications. Well, again, there's no evidence in this record of how somebody of that level of skill in the art would have viewed these. In fact, the evidence that is of record, the only evidence of record of anybody viewing this through the prism of one's skill in the art is in the Smith Declaration, which LifeScan submitted. What about the board? The board certainly in its determination was looking at it. They knew what the level of ordinary skill in the art was and adopted the level that you had suggested, right? They did. They did. They adopted the – there was no dispute about the level of skill. That's correct. But their findings in their – as we pointed out in our brief, some of their findings are simply not supported by the evidence. For example, with respect to Winarda, they refer to several lines in Winarda saying that, well, the Winarda second electrode takes measurements. And what they refer to for that second electrode is reference in Winarda to it taking measurements of resistance, not a measurement of the concentration of a substance, which is required at the second working electrode. So the board made findings that were simply not supported by the record. Okay. Thank you. Thank you. Thank you. Mr. Schaffer. Thank you, Dave. Please support John Schaffer on behalf of Pharmatech. First, to address this issue of Ralph Winarda and whether there's any record support for the second electrode. Can we talk about the bigger picture argument that's being made here, which is that whatever the result the board reached, it's not one that you led them to. I mean, the board did not really apply an appropriate standard of burden of proof for you. I mean, you did not submit an expert testimony. Dr. Wang, you pretty much concede that he doesn't mention the level of skill in the art. His sort of ipsy dixit that you would have known without putting it into a time frame or talking about the level of skill in the art is clearly not enough under our case law. So you fall back on, well, it's not complex technology, so it's okay. But it is complex technology. And you didn't dispute that the level of skill in the art was high. So why don't we have a situation in which the board has stepped out of its role as an adjudicator who's supposed to be looking at an adversary process and instead is becoming the adversary? First of all, there really was no dispute about skill in the art. And the issue of skill in the art should apply to various elements of the technology here. The issue we're looking at for skill of the art, and I think the focus here is on Nankai, is how you arrange three little blocks. You don't need to be highly skilled that there's only so many ways you can arrange a reference electrode into working electrodes. But you concede that your expert testimony was inadequate on that point, right? On that point, no, I don't. I don't consider it. They say it's conclusory because what Dr. Wang testified to is you can only arrange these things so many ways. I don't know what more evidence he would need to provide other than to say you have three blocks. You can arrange them that way, that way, that way, that way. There's really nothing else to say about how those blocks can be arranged. And you don't find it to be problematic that he doesn't refer to the level of skill in the art or put it into the appropriate time frame? No, because there's really no dispute about the level of skill in the art in this context. The problem is how can you rely on his declaration when he hasn't? It's not clear that he had the right frame of mind when he did the analysis. I accept that. And my point there is if we were talking about a complicated element of this technology, then you would have an argument. If we're talking about how the reagent formula transfers glucose into electrons, then you have an argument there. But with respect to what's being discussed here on Nankai, you're simply talking about the arrangement of the reference electrode with the two working electrodes. That's all we're talking about here, and that does not require any significant level of skill to know it can be arranged in one of three ways. Let me take that argument back a little bit because the argument was made that Woodruff doesn't apply to this instance because Woodruff only addresses rangers. And the argument here is that the arrangement, I think the argument you're coming to about the level of skill in the art, is that this was a critical arrangement. The specifications don't support that this is a critical arrangement at all. First of all, the specifications say you can arrange the working electrodes any way you want to, which would include a way to arrange it with respect to the reference electrode. Moreover, Woodruff says it talks about a range, but then it also talks about any other variable. How you arrange these three blocks is a variable. So you not only need to prove the criticality of this, you would need to prove that the result is unexpected. And I think it's important to look at the issue of criticality. Again, you look at what the specification says on this issue. The specification doesn't refer to it as critical. The specification simply refers to it as a preferred embodiment. But who's supposed to prove what when you're the one making the claim of obviousness? I mean, you know, this is part of my problem. You had the burden, and you had the burden to show that it's obvious. You don't have expert testimony showing that it's obvious. So you have to fall back on the fact that this is simple, and therefore anybody could do it. So we accept what the level of skill in the art is, and solely because there were a limited number of arrangements, that's your basis, your entire basis for your argument, that it would have been obvious, right? There's two bases there. One is that there's a limited number of options, and the results would be expected. And the argument here that there was no motivation to combine or any of these things, you want to promote and achieve accuracy, which is what we're talking about here. What about is the board entitled to look at the original prosecution here where the ordering of the electrodes was found not to be novel, to have been obvious over Winarta and Nankai in rejecting any claim to the strips?  And what they're arguing as criticality was not in the original application for this. The original application allowed any ordering, and only when Nankai was cited in prosecution did they come back and make an amendment to arrange in this particular order. And when you look at the specifications… And they didn't get the patent on the order, on the strip. They did not get a patent on the order and the strip, no. So that goes to that particular point about the ordering being obvious. And I think it's important this argument about criticality is not supported in the specification because the only advantage of this particular ordering would be in the very rare situation where both of the working electrodes are not covered completely in the exact same manner. Because if they're not, you're still going to get an error anyway. So this ordering is not necessarily significant. The argument that was also made that there was no evidence of a motivation to combine, motivation to combine is contained in all three of these patents. And I'm including the 105, which specifically says accuracy here is the motivation. Anything you can do to improve accuracy is a motivation with respect to these patents. So if we look first to the Nankai patent, in Nankai you have multiple measurements being taken and averaged. And Nankai specifically says that increases accuracy. That's all Schulman does is if you have multiple measurements, what are things you can do with multiple measurements? One thing you can do with multiple measurements is you can see if they're too different. And this argument that, you know, Schulman is somehow unique technology that someone would not be motivated to combine with a test strip doesn't make any sense because LifeScan before the district court specifically argued that this is odd. What Schulman is teaching in terms of if you have two samples that you compare them to see if they're too far apart is well-known, trivial, and known to everyone. And that's what the board found with respect to Schulman. We're not talking about Schulman for the purposes of anything unique it does with respect to implantable diabetic sensors. We're just talking for the basic proposition, which is what do you do when you have two measurements? And that's specifically what the board found. And when LifeScan argues you need to look at a patent as a whole, that point is you don't need to look at the specific invention. You need to look at everything the patent teaches. And what this patent teaches, what Schulman teaches, is if you are taking multiple measurements, you can average them and that's going to get you a better result. But the other thing you can do is look at if they're too different. And why would you be motivated to combine that with NANCHI? You already have the multiple measurements. You're going to be motivated because it increases accuracy, which is specifically what Dr. Wang said is what NANCHI says is what Winarda says and is specifically what the 105 patent says is their motivation. Why are you looking at what the 105 patent says for motivation anyway? The only reason I'm looking at it is this argument that there was no motivation to combine. Yeah, but stick to the prior when you're talking about motivation to combine. Okay, the motivation to combine is contained in NANCHI and Winarda, that you want to increase accuracy. And that is in Dr. Wang's declaration. He has his whole research article, review article that he published that is incorporated by reference that says that's the issue. Getting to this last issue of Winarda and the point Judge Dyke, you raised, which is the third sensor and the argument, oh, no one would be motivated to make that a working sensor. In our petition, we specifically reference the portions of Winarda that says it's made— and regardless of how you look at Winarda, that is going to generate an electrical current. Well, what record evidence did you submit that that third sensor can be adapted to take the specific calculations that are in issue here? Well, what we reference is we reference page 109 of our application. We reference Winarda, Winarda column 5, line 37 to 54, 7, lines 11 to 42, and 9, 4 to 14, where it has all the capabilities. It's made from the same substance. It has the same reagent layer on it, and it does generate a current. The current it generates initially, as defined in Winarda, is once the blood hits it, it causes the whole thing to start, so it triggers it. So you're conceding that there's nothing other than Winarda itself that you're saying explains all this. There's no expert testimony. There's nothing that you put before the board to explain how that third sensor could be adapted. Yeah, the way it would be adapted, again, is to improve accuracy. If you have all of the steps of generating the current, you just need the one additional step of taking the measurement. Rather than just using the current as a trigger, use that current to take a measurement. And if you're using that current to take a measurement because your motivation is to increase accuracy— So you're admitting that what you had was looking at Winarda and attorney argument, period. No, we also had Dr. Wang who said that you would do the same thing. If you're increasing accuracy, you can use something that has all the elements there to do it to just have it do it. It would be obvious to do that because you have all of those elements. Having your last sensor act as a trigger increases accuracy because you've ensured that your sensor has been completely covered. Because it's not going to start measuring until you get to that other sensor. But then again, if you took it a step further, you're going to increase accuracy further if you have that other sensor also take measurements. Because then you can compare the two. You can address the issue that was raised by Shulman and raised by the other prior art where you could have an error or a mistake in your sensor. That would provide that answer. And the motivation here, because we are dealing with a health care product, is to improve and create accuracy. Anything else? That's it. Thank you. Okay. Thank you, Mr. Wittenfeld. Thank you, Judge Diken. May it please the court. The director intervened in this appeal to address her authority to delegate the institution decision to the board. And as neither party has addressed that here, we are content to sit and rest on our brief as well, unless the court has questions. Okay. Thank you. Thank you. Now, Ms. Elderkin, you have rebuttal time. Thank you, Your Honor. There are a lot of moving targets here, and I want to address two of them. One has to do with Winarta. Throughout the proceeding in the Patent Office of the IPR, Pharmatech took the position that the WO electrode, that second electrode in Winarta, was capable of making a glucose measurement. It wasn't until we got the final written description, final written opinion, decision from the board, where the board acknowledged that modifications would have to be made to Winarta to be able to make a reading there. And the board said, and somebody skilled in the art would be capable of doing that. Well, at that point, we have no opportunity to respond to that. Today, I get another moving target. Counsel argues, well, the motivation to combine these references is in the patents. That has never been argued anywhere. You can look at the briefs. It's never been argued that the motivation to combine Winarta or Nankai with Shulman is found in the patents. The highlight has always been on the 19-word mantra from Dr. Wang that was repeated verbatim for 10 different prior art references as the motivation to combine all of them. A conclusory statement, a general statement, something that's not specific to particular references. So the argument now that it's found in the references is yet another example of a moving target. The evidence, the only evidence of record that was ever presented for why one skilled in the art would not have looked to combine Nankai and Winarta with Shulman was in the Smith Declaration, which was discounted by the board, not even mentioned. And Dr. Smith explained for a number of reasons why Shulman was so different from anything that Winarta and Nankai were doing. The ones skilled in the art wouldn't have gone there because the sensors are implanted. They're washed with blood. It's not an instance where people, one, is comparing measurements from a single sensor system. In Shulman, it's two different sensors in different parts of the body. Complete sensor systems, not two electrodes making measurements on a single strip. So that's all in the Smith Declaration. And that is the only evidence of record from the standpoint of somebody skilled in the art at the time of the invention with regard to motivation. And it supports Lyskant's position that there was no evidence of motivation. Okay. Thank you. Thank you, Mr. Aldegan. Thank both counsel. Thank all counsel. The case is submitted. And that concludes our session for this morning.